## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **FRANK H. KRUSE, as ADMINISTRATOR** | ) | |
| **For the Estate of James Michael Hall** | ) | |
| | ) | |
| **Plaintiff;** | ) | |
| | ) | |
| **v.** | ) | **CV: 2012-212** |
| | ) | |
| **CORIZON, INC.; MARCIA JOINER;** | ) | |
| **MARION CRITZ; BOBBY NEESE;** | ) | |
| **THADDOUS JOHNSON; SHERRELL** | ) | |
| **MARTIN; RONITRICK WELCH; ALICIA** | ) | |
| **CALLAGHAN; KEITH TURNER;** | ) | |
| **MAURICE HOUSTON; JOSHUA** | ) | |
| **ROBINSON; CRISTOPHER BYRD;** | ) | |
| **KEVIN NELSON; DARREN WALKER;** | ) | |
| **KEITH PENDER; MICHAEL SCOTT;** | ) | |
| **ANTHONY LOVE; SADIE** | ) | |
| **STALLWORTH; ROBERT MATUSZEK;** | ) | |
| **ANDREA WALTON; RODERIC DAVIS;** | ) | |
| **all in their individual capacities** | ) | |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

## COMPLAINT

1.      This is a civil action brought by Plaintiff, whose decedent, James Michael

Hall, was denied certain constitutional rights by Defendants while incarcerated in one of

the jail facilities operated jointly by the Sheriff of Mobile County and Correctional

Medical Services.  Specifically, Defendants were deliberately indifferent to Plaintiff's

decedent's serious medical and psychiatric needs in violation of his rights as a pretrial

detainee under the Fourteenth Amendment to the United States Constitution, and said deliberate indifference proximately caused his death.  Certain Defendants also violated Alabama law as detailed below.

## I.     JURISDICTION AND VENUE

2.      This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, and state law.  The Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

3.      This judicial district is an appropriate venue under 29 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the suit happened in this judicial district.  The Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

## II.     PARTIES

4.      Frank Kruse, the General Administrator of Mobile County, Alabama, is the duly appointed Administrator of the Estate of James Michael Hall (hereinafter "Hall"), who is deceased.  The Estate, through is Administrator, is duly authorized to litigate matters on behalf of the Estate of James Michael Hall.

5.      Defendant Corizon, Inc., formerly Correctional Medical Services, Inc. (and hereinafter referred to as "CMS" throughout) is a private for-profit corporation that is under a contractual obligation to Mobile County to provide medical care for inmates in the Mobile County Metro Jail facility ("Metro Jail").  CMS was operating under color of state law at all material times hereto.

6.      Defendants Marcia Joiner, Marion Critz, Bobby Neese, Thaddous Johnson, Sherrell Martin, Ronitrick Welch, Alicia Callaghan, Keith Turner, Maurice Houston, Joshua Robinson, Christopher Byrd, Kevin Nelson, Darren Walker, Keith Pender, Michael Scott, Anthony Love, and Sadie Stallworth were correctional officers or agents at Metro Jail at all material times hereto.  The aforementioned-Defendants are sued in their individual capacities only.

### III.    FACTS

7.      James Michael Hall was a 48 year old man who was arrested by Sheriffs' Deputies and jailed at the Mobile County Metro Jail on April 10, 2010.  Prior to his arrest, and during his stay in Metro Jail, Hall consistently and repeatedly exhibited bizarre, psychotic behavior.

### A.      Arrest

8.      Hall was residing in the home of the mother of Angela Dari Simmons ("Simmons"), at 10620 Jeff Hamilton Road, Mobile County, Mobile, Alabama, 36695.

9.      At approximately 9:00 A.M. on April 10, 2010, Deputy John McLain, a Mobile County Sheriff's Deputy, observed Hall "crawling on his hands and knees in his yard crying."  McLain advised the Sheriff's office of Hall's bizarre behavior and suggested another uniformed officer check on Hall.  McLain refrained from intervening himself "based on [Hall's] emotional state," fearing that McLain's intervention would have caused more confusion.

3

10.     Upon receiving McLain's call, Deputy Roland Frye responded to the alert and drove to 10620 Jeff Hamilton Road where he encountered Hall sitting under a tree. According to Deputy Frye, Hall stated that he did not need medical or other types of help, and Frye left.

11.     At approximately 3:30 p.m. on April 10, Simmons returned to her home at 10620 Jeff Hamilton Road and encountered Hall.  Simmons had left the residence two weeks earlier due to Hall's strange, psychotic behavior.  Hall had told Simmons that he had "seen demons in the house" and "was afraid to enter several of the rooms in the house." At some point, officers arrived and questioned Simmons and Hall.  Simmons stated that Hall continued to refuse to go into the residence, stating there were "evil spirits in the house."  Hall became agitated and "talked loud."  Hall repeated these beliefs and told the officers he was concerned about "people being after him."  Hall became irate, began screaming loudly, and continued to refuse to enter the house due to "demons."  Simmons advised the officers of Hall's prior delusions and also stated she was aware that Hall used drugs and had "huffed gas."  In addition, she said Hall had, two years earlier, constantly talked about "the world coming to an end."

12.     Two Mobile County Sheriff's Deputies, Jeffrey Hale and Roland Frye, arrived at the Jeff Hamilton Road residence, between 5:00 and 6:00 P.M., after complaints were received from a neighbor.  They observed that Simons was attempting to get Hall to go home but that he refused, stating that "something was wrong in the house." Hall spoke loudly, refused to comply, demanded that he was "not going fucking

anywhere" and was violently uncooperative.  Frye noticed that Hall was using profanity and was becoming irate.  According to Frye "[Hall's] eyes looked as if he had a thousand mile stare; he was acting psychotic."  Two neighbors, Robert Hinson and Jerry Vise, also provided the officers with information that Hall and Simmons had previously argued and were acting strangely that day, giving rise to Hinson's calls to the officers.

13.    Based upon his noncompliance and erratic, psychotic behavior, the deputies forced Hall to the ground, handcuffed him, and placed him under arrest. Hall was transported to Metro Jail by Deputy Hale and entered by way of the Sallyport, where he was taken into Booking.

14.    Hall was booked into Metro Jail at approximately 7:00 P.M. on April 10, 2010.  Corporal Marion Critz observed that Hall was noticeable due to his loud behavior going through the booking process.  According to Critz, one officer would normally escort the inmate to "dress out" but Critz assisted Officer Neese in escorting Hall to "dress out" because he was concerned Hall would become disorderly.

### B.    Force Used In Pod 602

15.    Hall was placed in a general population cell in Pod 602, B Wedge, Cell 710, without anyone addressing, classifying, or treating any of his aberrant and psychotic behavior.  Inmate Edmond Howard, who was booked immediately after Hall, was placed in the same cell as Hall at approximately 9:00 P.M.  Howard fell asleep but was later awakened by Hall whom he saw pacing around the cell, flexing his muscles, and pounding his fists into an open hand.  Hall pushed Howard down on his bunk, got in his

face, and stated, "I told you not to move!  No man is allowed in this place!  Don't move, stay right there!"

16.     Howard called out to Correctional Corporal Thaddous Johnson that Hall "was not acting right" and needed to be moved. Johnson heard Howard shout, "Get me out of here, this guy is crazy, he's trying to hurt me!"  When Johnson attempted to enter the cell, Hall threatened Johnson, stating: "move back, no man is allowed in here."  Hall attempted to block the opening of the cell door and Johnson tased the door, forcing Hall to release it.

17.     When Johnson opened the door and entered the cell, Hall immediately charged Johnson, swinging his arms with both fists clenched.  Johnson tased Hall more than one time, but it did not change Hall's behavior.  Johnson claimed he felt he was fighting for his life and placed a "Double Zero (00)" code.  Officers Marion Critz, Bobby Neese, Jeremy Malone, Ronitrick Welch, and Sherrell Martin all appeared at Halls' cell and intervened.  Officer Neese observed that Hall was making crazy statements including believing that he was God.   Welch, Neese and Johnson threw Hall to the floor, handcuffing him.  Officer Neese observed Johnson taze Hall three times in an attempt to calm him. Critz saw Welch taze Hall as well.  The tasing had no noticeable effect on Hall nor did it alter his psychotic behavior.  Officer Welch noted that the taser use was a "failure."  After the men handcuffed and secured Hall, the officers carried him down the stairway in the Pod and out to Pod 1005, I Wedge, Cell 1022, by way of Triage One.

According to taser reports maintained by the Jail and its staff, the officers tased Hall a total of 17 times while in Pod 602 (Johnson 15 times and Welch twice).

18.     Officer Critz noted that Hall was placed in 1005I-1022 "due to his behavior and incoherent conversation."   Hall was still resisting when his uniform pants were removed.  Officer Johnson reported that Hall was placed in restraints until further notice and that Nurse Alicia Callaghan was notified of this application of restraints.  Officer Ronitrick Welch also reported that Hall remained combative when they got him into cell 1022, where he was placed in leg irons and handcuffed.  At this point, a restraint log was started for Hall.

## C.     Triage on the Morning of April 11, 2010

19.     Correctional Medical Services' nurse, Alicia Callaghan, responded to the code 00 in Pod 602, and found the officers carrying Hall down the stairs of the second tier of Wedge F.  He was placed in a hallway outside of the Pod where Callahan observed that Hall was very combative and feared that Hall might bite her. Callahan claimed that Hall refused to allow her to assess his medical condition, although she observed he had a black eye and a mark on the left side of his face.  Hall refused to respond or to speak a word to Nurse Callahan.  Based upon Hall's behavior, Callahan directed that he be placed in Pod 1005I and left instructions for Hall to undergo a mental health evaluation.

## D.     Failure to Provide Appropriate Mental Health Care

20.     Marsha Joiner ("Joiner") was a Mental Health Worker employed by Metro Jail.  Joiner interviewed Hall on April 11, 2010, at approximately 11:00 A.M., to

determine if he needed to remain in Wedge 1005I, Cell 1022.  Joiner was provided information concerning Hall's prior psychotic conduct in the jail up to that point as well as his psychotic conduct before his arrest.  Joiner met briefly with Hall and after accepting as true his responses to questions concerning suicidal ideation, mental health history, and the basis for a black eye, Joiner ordered that he be moved out of Wedge 1005I and placed back in general population.  After Joiner met with Hall, Hall was ordered to be transferred to 1002D pod in the general population of Metro Jail.  Before Hall was transferred to back to general population, Joiner was again called to Hall's cell, this time due to a report that Hall was "banging his head against the wall."  When she arrived at Hall's cell, Joiner found Hall completely nude in his cell.

21.    In Joiner's brief contacts with Hall, he exhibited prevalent psychotic behavior, including hallucinations, destructive behavior, and self-destructive behavior. Despite these symptoms, and the threat Hall posed to himself and others as a result of his psychosis, Joiner never sought treatment for Hall's condition nor did she order that Hall be evaluated by a nurse or physician.  Instead, after her contact with Hall, Joiner completed a form saying that Hall's affect, mood, and thought processes were "adequate," despite an abundance of evidence to the contrary.  Joiner did not follow-up with Hall, nor did she request any other mental health worker, nurse or physician to consult or follow-up with Hall, to assess his mental or physical condition prior to his death.

### E.      Forcible Removal from 1005I Wedge to 1002F Wedge

22.      While housed in Wedge 1005I, Cell 1022, Hall had demonstrated violent tendencies when the door to his cell was opened.  CO Ronitrick Welch saw Hall the next day in Pod 1002 when Welch was collecting food trays.  Hall refused to hand out his tray to Welch, stating, "let me pray."  On the afternoon of April 11, Corporal Andrea King, Pod Officer, ordered the officers to prepare Hall for transport out of Wedge 1005I but Hall remained nude and refused to dress.  At approximately 1:00 P.M., at the direction of Cpl. King, Correctional Officer Christopher Byrd, Correctional Officer Joshua Robinson, and Correctional Officer Kevin Nelson entered the cell to dress Hall for the move.  When Hall refused to dress, Cpl. King, knowing Hall's prior psychotic behavior, ordered the officers out and alerted security.

23.      At approximately 1:10 P.M., Lt. Keith Turner and Sgt. Maurice Houston arrived at Hall's cell.  While the officers were attempting to dress Hall for the move, Sgt. Houston stated that Hall was "talking erratic, somewhat out of his head and he refused to keep his uniform on."  When handed a uniform, Hall said, "I'm not putting that on, it smells like smoke," that "God would not allow me to get dressed because Christ is talking to me," and "I can't put these clothes on because the angels can't come out of me."  When Hall continued to refuse to dress, Sgt. Houston decided to move Hall while Hall was nude.  When the officers approached Hall to move him, Hall began swinging his arms with a closed fist and kicking at the officers.  Sgt. Houston tased Hall at least four times and Lt. Turner at least twice.  Lt. Turner observed that the tasers had little or no

effect on Hall, who continued to fight the officers.  Eventually, Hall was restrained, handcuffed and the officers moved him to 1002F Wedge in the general population, cell 1066.  1002F Wedge, however, was ill equipped to observe or monitor an inmate who was in Hall's condition.  The officers removed Hall's handcuffs and backed out of the cell.

24.     In the "Use of Taser Report," Officer Houston and Lt. Turner both noted that Hall was not wearing heavy clothing while they were tasing him, as described above, and they both characterized his demeanor and disposition as "Mental 31/Disorderly." Despite this characterization, no one ordered or requested that Hall be evaluated by a nurse, physician or other healthcare professional.  According to taser reports maintained by the Jail and its staff, the officers tased Hall a total of 6 times while he was in Wedge 1002F (Houston four times and Welch twice).

25.     Lt. Turner returned and observed Hall "acting-out" in his cell, hitting his head on the wall, while talking about God.  Sgt. Houston noticed that as soon as they placed Hall in 1002F, and began to walk back away, Hall began screaming through the food slot.  Joshua Robinson made periodic checks on Hall in 1002F and overheard him making statements such as, "God, please come and get these people away from me." Robinson observed Hall standing with his face against the wall, talking as if he was speaking to someone.  Later, he heard an inmate call the Pod, stating that he thought Hall was ramming his head into the wall.  When Robinson checked Hall, he saw an injury on

Hall's head.  A nurse was called and also observed a mark on Hall's forehead.  Hall refused to allow the nurse into his cell.

26.    Officer Christopher Byrd also observed Hall in Pod 1002F.  Approximately one hour after he was moved into that Pod, Byrd observed Hall kneeling at the cell door and told Byrd, "I'm getting ready to go see God.  I'm going to see God."  Byrd noted that Hall was talking erratically off and on for the remainder of his shift and making statements such as, "I'm ready to meet my maker" and other intelligible comments.  Later, at approximately 4:30, Officers Byrd and Nelson observed that Hall refused to give back his evening tray.  Throughout his shift at 1002F, Officer Nelson observed Hall talking through the food slot of his cell door, making references to "God and Zeus" and exhibiting psychotic and delusional behavior.  Mental health worker Marcia Joiner visited Hall in Wedge 1002F due to reports of Hall injuring himself and exhibiting erratic and bizarre behavior.  See Section E, above.

## F.    Death at the Inmate Transport Holding Cell

27.    On April 12, 2010, shortly before 8:00 A.M. Correctional Officers Darren Walker and Keith Pender, arrived at Hall's cell in Wedge 1002F, Cell 1066, to escort him to a scheduled hearing in Mobile County District Court.  Pender observed that Hall was not wearing any clothes when he arrived at Hall's cell.  Pender also noticed that Hall was bruised all over his face, head, and feet.  When Walker advised Hall that he was going to court, Walker observed that Hall appeared delusional and stated that he wanted to return to his cell.  Pender and Walker then placed Hall in handcuffs, a waist chain and leg irons,

given Hall's conduct at the jail.  Even though Hall was in full restraints, he began to struggle in an attempt to remain in his cell.

28.     When Lt. Stallworth noticed Pender and Walker pursuing Hall down the hall, she ordered Hall into the Transport Holding Cell.  Because he resisted and refused to go, Stallworth then tased him twice.  Hall was "continuously, wildly" talking and incoherent.  She had "never seen an inmate act" the way Hall was acting.  Hall got to his feet and came at her in an aggressive manner, so she tased him again, but he continued to fight and try to get to his feet.  Hall grabbed Sgt. Love and Sgt. Love tased Hall as well. Lt. Stallworth believed that she had never witnessed an inmate so combative who did not calm down after being tased.

29.     Due to Hall's struggles, Lt. Stallworth arrived at Hall's cell and tased Hall five times.  Sgt. Anthony Love then entered the cell and tased Hall multiple times while Hall was restrained.  According to Officer Walker, Hall became very disoriented and aggressive and Lt. Stallworth tased him again.  When Hall refused to release Sgt. Love, Cpl. Michael Scott struck Hall with an asp on his arm.  Hall would not come down until Nurse Roderic Davis appeared and gave him an injection.  Thereupon, CO Walker believed Hall stopped breathing.

30.     Walking with Hall down the hall, Pender noticed that he was unsteady and not fully cooperating.  Upon reaching the holding cell, he became so violent and combative, that the officers took him to the floor.  Cpl. Michael Scott overheard a taser deploy and appeared, finding a number of officers struggling to hold Hall down.  Even

after being tased and struck by Scott's asp, Hall continued to attempt to get to his feet and struggled until a Nurse arrived and gave him an injection.

31.     CO Sgt. Anthony Love arrived at the Transport Holding Cell and saw Lt. Stallworth, Cpl. Scott, and CO Walker attempting to subdue Hall who was thrashing in an attempt to get away.  Love also entered the cell and deployed his taser on Hall.  Love saw several nurses arrive and eventually Hall was administered an injection.  At that point, Love thought that Hall appeared not to be breathing.

32.     According to taser reports maintained by the Jail and its staff, the officers tasered Hall a total of 18 times in the Transport Holding Cell. (Stallworth five times and Love thirteen times.)

33.     At that point, Lt. Stallworth believed Hall needed to be medicated.  The various nurses located the only record in Hall file, a "Movement Sheet," and took it to Dr. Charles Smith, the CMS psychiatrist.  Smith ordered Hall be administered five milligrams of Haldol and two milligrams of Ativan.  Nurse Walton prepared the medication and returned to the holding cell.

34.     Nurse Davis observed Hall was thrashing about, even with five officers on top of him, and was still extremely combative.  Nurse Andrea Walton arrived and stated that she would notify Mental Health to have Hall evaluated.  Nurse Walton returned to the cell with the medication and Nurse Davis administered the injection into Hall's hip.

35.     At some point, either in the cell or after Hall was transported by gurney to the clinic, Hall stopped breathing and Nurse Practitioner Amy Nelson immediately

ordered cardiopulmonary resuscitation.   Nurse Lisa Battles retrieved the automatic emergency defibrillator (AED) from her officer but it was only for training and inoperable.  Nurse Walton went to the clinic office and retrieved a functioning AED but it indicated not to shock.  Nurse Walton began breathing for Hall by using an AmbuBag and at some point 9-1-1 was called and an ambulance was dispatched.

36.   Hall never regained consciousness and died as a proximate result of the injuries he received as noted above.

## IV.   CAUSES OF ACTION

### Count I.
### UNCONSTITUTIONAL USE OF FORCE
### 42 U.S.C. § 1983

37.   Plaintiff reasserts the allegations contained in Paragraphs 1-36 above and incorporates the same by reference herein.

38.   Marion Critz; Bobby Neese; Thaddous Johnson; Sherrell Martin; Ronitrick Welch; Alicia Callaghan; Keith Turner; Maurice Houston; Joshua Robinson; Christopher Byrd; Kevin Nelson; Darren Walker; Keith Pender; Michael Scott; Anthony Love; Sadie Stallworth used excessive force upon Hall and thereby violated his Fourteenth Amendment Due Process rights to be free from cruel and unusual punishment.

39.   Said defendants' conduct posed a significant risk to the safety of Hall and inflicted unnecessary and wanton pain and suffering upon Hall without a good faith effort.  Said Defendants lacked a good faith effort to maintain or restore discipline and instead acted maliciously and/or sadistically for the purpose of causing harm.

40.     As a result of their conduct, Hall suffered injury, pain and suffering, and eventually death.

41.     The said defendants' conduct was done with reckless indifference or malice to the Federally protected rights of Hall.

**Count II.**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**42 U.S.C. § 1983**

42.     Plaintiff reasserts the allegations contained in Paragraphs 1-36 above and incorporates the same by reference herein.

43.     Defendant Marion Critz; Bobby Neese; Thaddous Johnson; Sherrell Martin; Ronitrick Welch; Alicia Callaghan; Keith Turner; Maurice Houston; Joshua Robinson; Christopher Byrd; Kevin Nelson; Darren Walker; Keith Pender; Michael Scott; Anthony Love; Sadie Stallworth, Alicia Callaghan and Marsha Joiner, acting under color of state law within the meaning prescribed by 42 U.S.C. § 1983, were deliberately indifferent to Hall's serious mental health needs which required, among other things, assessment, treatment, and monitoring.   These defendants, despite knowledge of Hall's serious medical need, did not take appropriate action and thereby deprived Hall of his rights as a pretrial detainee under the Fourteenth Amendment of the Constitution of the United States, in violation of 42 U.S.C. § 1983.

44.     As a proximate result of their conduct, Hall suffered injury, pain and suffering, and eventually death.

45.     The said defendants' conduct was done with reckless indifference or malice

15

to the Federally protected rights of Hall.

**Count III.**
**Correctional Medical Services of Alabama, Inc.**
**DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS**
**42 U.S.C. § 1983**

46.     Plaintiff reasserts the allegations contained in Paragraphs 1-36 above and incorporates the same by reference herein.

47.     CMS was aware that the potential harm to Hall was sufficiently serious and yet was deliberately indifferent to his health and safety.  CMS was aware of the substantial risk of serious injury to Hall but nevertheless failed to take appropriate steps to protect him from a known danger.  CMS failed to act despite its knowledge of substantial risk of serious harm to Hall.

48.     CMS maintained a policy, practice, or custom that sanctioned the maintenance of conditions that infringed upon the constitutional rights of Hall.  This policy, custom, or practice was the direct or moving force behind the constitutional violations suffered by Hall.

49.     CMS' policy, custom, or practice was in itself unconstitutional.  In the alternative, CMS' actual practice, if not its written policy, toward the treatment of mentally ill inmates was so inadequate that CMS was on notice at the time Deceased was incarcerated that there was a substantial risk that he would be deprived of necessary care in violation of his Fourteenth Amendment rights.

50.     Upon information and belief, CMS failed to adequately train its employees,

monitor its employees, supervise its employees, and/or discipline its employees, and that these failures were so widespread as to constitute deliberate indifference to the health and safety of mentally ill inmates housed at the Metro Jail, and Hall in particular.

51.     CMS' conduct was done with malice or reckless indifference to the federally protected rights of the Plaintiff.

### Count IV.
### ASSAULT AND BATTERY
### WRONGFUL DEATH – STATE LAW CLAIM

52.     Plaintiff reasserts the allegations contained in Paragraphs 1-36 above and incorporates the same by reference herein.

53.     Plaintiff brings this count pursuant to Ala. Code (1975) §6-5-410, the Alabama Wrongful Death Statute.

54.     Marion Critz; Bobby Neese; Thaddous Johnson; Sherrell Martin; Ronitrick Welch; Alicia Callaghan; Keith Turner; Maurice Houston; Joshua Robinson; Christopher Byrd; Kevin Nelson; Darren Walker; Keith Pender; Michael Scott; Anthony Love; Sadie Stallworth committed assault and battery upon Hall.  As a proximate result of their conduct, Hall was caused to suffer injury, pain and suffering, and eventually death.

55.     In the course of their assault and battery, said officers acted willfully, maliciously, fraudulently, in bad faith, and or beyond their authority, and/or under a mistaken impression of law.

56.     Defendants' conduct was done with malice or reckless indifference giving rise to Hall's entitlement to punitive damages.

17

**Count V.**
**NEGLIGENCE**
**WRONGFUL DEATH – STATE LAW CLAIM**

57.     Plaintiff reasserts the allegations contained in Paragraphs 1-36 above and incorporates the same by reference herein.

58.     Plaintiff brings this count pursuant to Ala. Code (1975) §6-5-410, the Alabama Wrongful Death Statute against all defendants.

59.     Under Ala. Code (1975) Sections 14-6-1, *et seq.* and 21-7-1, *et seq.*, Defendants owed a duty of care to Hall to protect him from harm and injury while in their custodial care.  Said Defendants breached that duty and negligently permitted Hall to suffer assault, battery, tasing, lack of medical and psychiatric care, and other injury.  As a result of the Defendants' negligence, Hall suffered injury, which proximately caused his death.

60.     In the course of their negligence, said Defendants acted willfully, maliciously, fraudulently, in bad faith, and or beyond their authority, and/or under a mistaken impression of law.  As a proximate result of the above-described negligence, Hall suffered injuries from which he died.

**Count VI.**
**MEDICAL NEGLIGENCE**

61.     Plaintiff reasserts the allegations contained in Paragraphs 1-36 above and incorporates the same by reference herein.

62.     At all material times hereto, Defendants CMS, Callahan, and Joiner owed a

duty to Hall to provide reasonably proper and adequate medical, psychiatric and/or allied healthcare services to him.  Plaintiff brings this cause of action pursuant to the Alabama Medical Liability Act.

63.   At the times and places listed above, Defendants Callahan and Joiner negligently departed from the accepted standards of care applicable to similarly situated nurses, mental health workers, and/or allied healthcare providers which were in effect in one or more of the following respects:

Nurse Callahan:

(a) Negligently failing to order and/or request a psychiatric consultation or evaluation;

(b) Negligently failing to recognize and treat Hall's psychosis and/or physical injuries;

(c) Negligently failing to enter appropriate orders and institute appropriate safeguards to monitor Hall's condition at Metro Jail from April 10, 2010 through April 12, 2010;

(d) Negligently failing to appropriately follow-up with Hall and monitor his condition;

(e) Negligently failing to appreciate and act upon Hall's psychiatric and physical condition from April 10, 2010 through April 12, 2010;

(f) Negligently failing to obtain and/or provide appropriate medical care and treatment to Hall from April 10, 2010 through April 12, 2010;

(g) Negligently failing to diagnose Hall's psychiatric and physical condition;

(h) Negligently failing to timely act to obtain treatment for Hall from April 10, 2010 through April 12, 2010;

(i) Negligently supervising, directing and/or instructing her agents, servants, and/or employees including, but not limited to Defendant Joiner;

(j) Negligently failing to provide proper medical, psychiatric and/or allied health care and treatment for Hall;

(k) Negligently failing to preserve and protect Hall's physical and mental condition to ensure that he was not a danger to himself or others;

(l) Negligently failing to comply with the policies and procedures of Metro Jail and the laws of the State of Alabama in the care and treatment of Hall;

(m) Negligently failing to comply with the applicable medical, nursing, psychiatric and/or allied healthcare standards and procedures;

(n) Negligently failing to provide adequate medical, nursing, psychiatric and/or allied healthcare services to Hall;

(o) Negligently failing to obtain and/or provide appropriate medical care and treatment for Hall on each day he was at Metro Jail from April 10, 2010 through April 12, 2010;

(p) Negligently failing to perform an adequate evaluation of Hall to ensure he was not a danger to himself or to others; and

(q) Negligently failing to take adequate steps necessary to treat Hall's physical and mental condition as mentioned above and/or prevent his continued mental and physical demise.

Defendant Joiner:

(a) Negligently failing to order and/or request a psychiatric consultation or evaluation;

(b) Negligently failing to recognize and treat Hall's psychosis and/or physical injuries;

(c) Negligently failing to enter appropriate orders and institute appropriate safeguards to monitor Hall's condition at Metro Jail from April 10, 2010

20

through April 12, 2010;

(d) Negligently failing to appropriately follow-up with Hall and monitor his condition;

(e) Negligently failing to appreciate and act upon Hall's psychiatric and physical condition from April 10, 2010 through April 12, 2010;

(f) Negligently failing to obtain and/or provide appropriate medical care and treatment to Hall from April 10, 2010 through April 12, 2010;

(g) Negligently failing to diagnose Hall's psychiatric and physical condition;

(h) Negligently failing to timely act to obtain treatment for Hall from April 10, 2010 through April 12, 2010;

(i) Negligently failing to provide proper medical, psychiatric and/or allied health care and treatment for Hall;

(j) Negligently failing to preserve and protect Hall's physical and mental condition to ensure that he was not a danger to himself or others;

(k) Negligently failing to comply with the policies and procedures of Metro Jail and the laws of the State of Alabama in the care and treatment of Hall;

(l) Negligently failing to comply with the applicable medical, nursing, psychiatric and/or allied healthcare standards and procedures;

(m)   Negligently failing to provide adequate medical, nursing, psychiatric and/or allied healthcare services to Hall;

(n) Negligently failing to obtain and/or provide appropriate medical care and treatment for Hall on each day he was at Metro Jail from April 10, 2010 through April 12, 2010;

(o) Negligently failing to perform an adequate evaluation of Hall to ensure he was not a danger to himself or to others; and

(q) Negligently failing to take adequate steps necessary to treat Hall's

21

physical and mental condition as mentioned above and/or prevent his continued mental demise.

CMS:

(a) Negligently failing to order and/or request a psychiatric consultation or evaluation;

(b) Negligently failing to recognize and treat Hall's psychosis and/or physical injuries;

(c) Negligently failing to enter appropriate orders and institute appropriate safeguards to monitor Hall's condition at Metro Jail from April 10, 2010 through April 12, 2010;

(d) Negligently failing to appropriately follow-up with Hall and monitor his condition;

(e) Negligently failing to appreciate and act upon Hall's psychiatric and physical condition from April 10, 2010 through April 12, 2010;

(f) Negligently failing to obtain and/or provide appropriate medical care and treatment to Hall from April 10, 2010 through April 12, 2010;

(g) Negligently failing to diagnose Hall's psychiatric and physical condition;

(h) Negligently failing to timely act to obtain treatment for Hall from April 10, 2010 through April 12, 2010;

(i) Negligently supervising, directing, hiring, training, retaining, and/or instructing its agents, servants, and/or employees including, but not limited to Defendants Callahan and Joiner;

(j) Negligently failing to provide proper medical, psychiatric and/or allied health care and treatment for Hall;

(k) Negligently failing to preserve and protect Hall's physical and mental condition to ensure that he was not a danger to himself or others;

(l) Negligently failing to comply with the policies and procedures of Metro

Jail and the laws of the State of Alabama in the care and treatment of Hall;

(m)   Negligently failing to comply with the applicable medical, nursing, psychiatric and/or allied healthcare standards and procedures;

(n) Negligently failing to provide adequate medical, nursing, psychiatric and/or allied healthcare services to Hall;

(o) Negligently failing to obtain and/or provide appropriate medical care and treatment for Hall on each day he was at Metro Jail from April 10, 2010 through April 12, 2010;

(p) Negligently failing to perform an adequate evaluation of Hall to ensure he was not a danger to himself or to others; and

(q) Negligently failing to take adequate steps necessary to treat Hall's physical and mental condition as mentioned above and/or prevent his continued mental and physical demise.

64.    In the course of their negligence, said Defendants acted willfully, maliciously, fraudulently, in bad faith, and or beyond their authority, and/or under a mistaken impression of law.

65.    As a proximate result of the above-described negligence, Hall suffered injuries from which he died.

## Count VII.
## MEDICAL WANTONNESS

66.    Plaintiff reasserts the allegations contained in Paragraphs 1-36 above and incorporates the same by reference herein.

67.    At all material times hereto, Defendants CMS, Callahan, and Joiner owed a duty to Hall to provide reasonably proper and adequate medical, psychiatric and/or allied

healthcare services to him.  Plaintiff brings this cause of action pursuant to the Alabama

Medical Liability Act.

68.    At the times and places listed above, Defendants CMS, Callahan and Joiner

wantonly departed from the accepted standards of care applicable to similarly situated

nurses, mental health workers, and/or allied healthcare providers which were in effect in

one or more of the following respects:

Nurse Callahan:

(a) Wantonly failing to order and/or request a psychiatric consultation or evaluation;

(b) Wantonly failing to recognize and treat Hall's psychosis and/or physical injuries;

(c) Wantonly failing to enter appropriate orders and institute appropriate safeguards to monitor Hall's condition at Metro Jail from April 10, 2010 through April 12, 2010;

(d) Wantonly failing to appropriately follow-up with Hall and monitor his condition;

(e) Wantonly failing to appreciate and act upon Hall's psychiatric and physical condition from April 10, 2010 through April 12, 2010;

(f) Wantonly failing to obtain and/or provide appropriate medical care and treatment to Hall from April 10, 2010 through April 12, 2010;

(g) Wantonly failing to diagnose Hall's psychiatric and physical condition;

(h) Wantonly failing to timely act to obtain treatment for Hall from April 10, 2010 through April 12, 2010;

(i) Wantonly supervising, directing and/or instructing her agents, servants, and/or employees including, but not limited to Defendant Joiner;

24

(j) Wantonly failing to provide proper medical, psychiatric and/or allied health care and treatment for Hall;

(k) Wantonly failing to preserve and protect Hall's physical and mental condition to ensure that he was not a danger to himself or others;

(l) Wantonly failing to comply with the policies and procedures of Metro Jail and the laws of the State of Alabama in the care and treatment of Hall;

(m)   Wantonly failing to comply with the applicable medical, nursing, psychiatric and/or allied healthcare standards and procedures;

(n) Wantonly failing to provide adequate medical, nursing, psychiatric and/or allied healthcare services to Hall;

(o) Wantonly failing to obtain and/or provide appropriate medical care and treatment for Hall on each day he was at Metro Jail from April 10, 2010 through April 12, 2010;

(p) Wantonly failing to perform an adequate evaluation of Hall to ensure he was not a danger to himself or to others; and

(q) Wantonly failing to take adequate steps necessary to treat Hall's physical and mental condition as mentioned above and/or prevent his continued mental demise.

Defendant Joiner:

(a) Wantonly failing to order and/or request a psychiatric consultation or evaluation;

(b) Wantonly failing to recognize and treat Hall's psychosis and/or physical injuries;

(c) Wantonly failing to enter appropriate orders and institute appropriate safeguards to monitor Hall's condition at Metro Jail from April 10, 2010 through April 12, 2010;

(d) Wantonly failing to appropriately follow-up with Hall and monitor his condition;

(e) Wantonly failing to appreciate and act upon Hall's psychiatric and physical condition from April 10, 2010 through April 12, 2010;

(f) Wantonly failing to obtain and/or provide appropriate medical care and treatment to Hall from April 10, 2010 through April 12, 2010;

(g) Wantonly failing to diagnose Hall's psychiatric and physical condition;

(h) Wantonly failing to timely act to obtain treatment for Hall from April 10, 2010 through April 12, 2010;

(i) Wantonly failing to provide proper medical, psychiatric and/or allied health care and treatment for Hall;

(j) Wantonly failing to preserve and protect Hall's physical and mental condition to ensure that he was not a danger to himself or others;

(k) Wantonly failing to comply with the policies and procedures of Metro Jail and the laws of the State of Alabama in the care and treatment of Hall;

(l) Wantonly failing to comply with the applicable medical, nursing, psychiatric and/or allied healthcare standards and procedures;

(m)  Wantonly failing to provide adequate medical, nursing, psychiatric and/or allied healthcare services to Hall;

(n) Wantonly failing to obtain and/or provide appropriate medical care and treatment for Hall on each day he was at Metro Jail from April 10, 2010 through April 12, 2010;

(o) Wantonly failing to perform an adequate evaluation of Hall to ensure he was not a danger to himself or to others; and

(q) Wantonly failing to take adequate steps necessary to treat Hall's physical and mental condition as mentioned above and/or prevent his continued mental demise.

<u>CMS</u>:

(a) Wantonly failing to order and/or request a psychiatric consultation or evaluation;

(b) Wantonly failing to recognize and treat Hall's psychosis and/or physical injuries;

(c) Wantonly failing to enter appropriate orders and institute appropriate safeguards to monitor Hall's condition at Metro Jail from April 10, 2010 through April 12, 2010;

(d) Wantonly failing to appropriately follow-up with Hall and monitor his condition;

(e) Wantonly failing to appreciate and act upon Hall's psychiatric and physical condition from April 10, 2010 through April 12, 2010;

(f) Wantonly failing to obtain and/or provide appropriate medical care and treatment to Hall from April 10, 2010 through April 12, 2010;

(g) Wantonly failing to diagnose Hall's psychiatric and physical condition;

(h) Wantonly failing to timely act to obtain treatment for Hall from April 10, 2010 through April 12, 2010;

(i) Wantonly supervising, directing, hiring, retaining, training, and/or instructing its agents, servants, and/or employees including, but not limited to Defendants Callahan and Joiner;

(j) Wantonly failing to provide proper medical, psychiatric and/or allied health care and treatment for Hall;

(k) Wantonly failing to preserve and protect Hall's physical and mental condition to ensure that he was not a danger to himself or others;

(l) Wantonly failing to comply with the policies and procedures of Metro Jail and the laws of the State of Alabama in the care and treatment of Hall;

(m)    Wantonly failing to comply with the applicable medical, nursing,

27

psychiatric and/or allied healthcare standards and procedures;

(n) Wantonly failing to provide adequate medical, nursing, psychiatric and/or allied healthcare services to Hall;

(o) Wantonly failing to obtain and/or provide appropriate medical care and treatment for Hall on each day he was at Metro Jail from April 10, 2010 through April 12, 2010;

(p) Wantonly failing to perform an adequate evaluation of Hall to ensure he was not a danger to himself or to others; and

(q) Wantonly failing to take adequate steps necessary to treat Hall's physical and mental condition as mentioned above and/or prevent his continued mental demise.

69.     As a proximate result of the above-described wantonness, Hall suffered injuries from which he died.

## V.  RELIEF SOUGHT

70.     As relief, Plaintiff seeks the following:

a)     That he be awarded such compensatory damages as a jury shall determine from the evidence he is entitled to recover;

b)     That he be awarded against the individual defendants such punitive damages as a jury shall determine form the evidence he is entitled to recover;

c)     That he be awarded prejudgment and post judgment interest at the highest rates allowed by law;

d)     That he be awarded the costs of this action, his reasonable attorneys' fees, and his reasonable expert witness fees; and

e)      That he be awarded such other and further relief to which he is justly

entitled.

Respectfully submitted this 26th day of March, 2012.

*/s/Henry Brewster*
Henry Brewster (BREWH7737)
HENRY BREWSTER, LLC
205 N. Conception Street
Mobile, AL 36633-1051
Telephone:  (251) 338-0630
Facsimile: (251) 338-0632
Email: **hbrewster@brewsterlaw.net**


*/s/Desmond V. Tobias*
Desmond V. Tobias (TOBID0094)
*/s/Bryan E. Comer*
Bryan E. Comer (COMEB1469)
TOBIAS & COMER, LLC
Post Office Box 1784
Mobile, Alabama 36633
Telephone: (251) 432-5001
Facsimile: (251) 432-0714
Email: **desi@tobiascomer.com**
Email: **bryan@tobiascomer.com**


Attorneys for Plaintiff


PLAINTIFF REQUESTS A JURY TRIAL

*/s/Bryan Comer*


DEFENDANT CORIZON, INC. MAY BE SERVED AT:

Corizon, Inc.
c/o C T Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

29

<u>ALL OTHER DEFENDANTS MAY BE SERVED AT:</u>

Mobile County Metro Jail
450 Saint Emanuel Street
Mobile, Alabama 36603