## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **FRANK H. KRUSE, etc.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 12-0212-WS-B** |
| | ) |
| **CORIZON, INC., et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

This matter is before the Court on the motion of Lieutenant Keith Turner, Lieutenant Sadie Stallworth, Sergeant Maurice Houston, Lieutenant Anthony Love, Corporal Michael Scott and Officer Joshua Robinson (collectively, "the Correctional Officer defendants") for summary judgment.  (Doc. 102).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 103, 113, 122), and the motion is ripe for resolution.  After careful consideration, the Court concludes that the motion is due to be granted.

## BACKGROUND

According to the complaint, (Doc. 1), on the evening of Saturday, April 10, 2010, the plaintiff's decedent, James Michael Hall, was arrested on minor charges after exhibiting bizarre behavior.  Various correctional officers employed force against the plaintiff, still exhibiting such behavior, on Saturday night, on Sunday afternoon, April 11, and on Monday morning, April 12.  Hall stopped breathing shortly after the third episode and expired without regaining consciousness.

The complaint names 15 correctional officers, five health care workers and one health care entity as defendants.  The Court recently dismissed nine of the correctional

officers on the parties' joint stipulation.  (Doc. 109).[1]  The counts asserted against the remaining six correctional officers are as follows:

- Count One         Unconstitutional use of force
- Count Two         Deliberate indifference to serious medical needs
- Count Four        Assault and battery/wrongful death
- Count Five        Negligence/wrongful death

(Doc. 1 at 14-18).


## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*.  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury

---

[1] The Court dismissed three health care workers on the plaintiff's request.  (Doc. 55). The motions for summary judgment filed by the remaining two health care workers and one health care entity are resolved by separate order.

could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2]  Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited.  Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust*

---

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

*Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Excessive Force.

The excessive force claim is based on the three episodes noted above. As the plaintiff acknowledges, (Doc. 113 at 2 n.2), none of the Correctional Officer defendants participated in the first use of force on the morning of April 11. The plaintiff identifies defendants Turner, Houston and Robinson as participating in the second use of force on the afternoon of April 11. (*Id*. at 8-10, 24). And he identifies defendants Stallworth, Love and Scott as involved in the third use of force on the morning of April 12. (*Id*. at 11-15, 24).

### A. Abatement.

"As a general rule, causes of action in tort do not survive in favor of the personal representative of the deceased." *Continental National Indemnity Co. v. Fields*, 926 So. 2d 1033, 1037 (Ala. 2005). By statute, contract "claims upon which no action has been filed" survive in favor of a personal representative, but the only tort claims that survive are "personal claims upon which an action has been filed." Ala. Code § 6-5-462. Section 6-5-462 "did not change the common-law rule in Alabama that a cause of action in tort does not survive in favor of the personal representative of the deceased." *Fields*, 926 So. 2d at 1037; *accord Bassie v. Obstetrics & Gynecology Associates*, 828 So. 2d 280, 282 (Ala. 2002) ("In Alabama, a deceased's unfiled tort claims do not survive the death of the putative plaintiff.") (citing Section 6-5-462). The Alabama rule applies to actions brought under Section 1983. *Estate of Gilliam v. City of Prattville*, 639 F.3d 1041, 1047, 1049-50 (11th Cir. 2011).

The Correctional Officer defendants do not challenge *Gilliam*'s proposition that, "when a constitutional violation actually causes the injured party's death, a § 1983 claim can be asserted through the Alabama wrongful death statute …." 639 F.3d at 1047-48.

They do, however, maintain that their alleged excessive force did not cause Hall's death and that the excessive force claims therefore abate under *Gilliam*.  (Doc. 103 at 9).

The plaintiff responds by pointing to the testimony of his expert.  (Doc. 113 at 29, 36-37).  Dr. Turner testified that, on the morning he died, the plaintiff experienced an episode of excited delirium,[3] which caused his heart to go into arrhythmia and then stop.  (Turner Deposition at 25-26).  She opined that the defendants' struggle with Hall while he was experiencing excited delirium further stressed his body and contributed to his death, to the extent she labeled his death a homicide.  (*Id*. at 28-29).  The Correctional Officer defendants in reply offer only the unexplained and plainly incorrect assertion that the plaintiff has presented no medical evidence of causation.  (Doc. 122 at 1-2).

The plaintiff offers no similar evidence concerning the second use of force.  And no wonder since, as the Correctional Officer defendants point out, (Doc. 122 at 2), his expert testified that she had no way to determine whether the second incident contributed to the excited delirium Hall experienced the following morning.  (Turner Deposition at 33-34).  With no evidence that the second use of force caused Hall's death, the plaintiff's excessive force claim is abated as to that incident.  Defendants Turner, Houston and Robinson are thus entitled to summary judgment as to this claim.[4]

### B.  Fourteenth Amendment Analysis.

"Claims involving the mistreatment of … pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners."  *Bozeman v. Orum*, 422 F.3d 1265, 1271 (11th Cir. 2005) (internal quotes omitted).  The Fourteenth Amendment thus applies to claims of excessive force by pretrial detainees such as Hall, *id*., and the complaint properly invokes the Fourteenth

---

[3] *See generally Mann v. Taser International, Inc*., 588 F.3d 1291, 1299 n.4 (11th Cir. 2009) (discussing the causes and symptoms of excited delirium).

[4] The plaintiff's cryptic insistence that the abatement argument is "of no moment," (Doc. 113 at 24 n.11), is unsupported by argument or by his two unexplained case citations.

Amendment.  (Doc. 1 at 2).  Because "[a] claim of excessive force under the Fourteenth Amendment is analyzed as if it were an excessive-force claim under the Eighth Amendment," courts "look to decisional law of excessive-force claims under both the Fourteenth and Eighth Amendments."  *Fennell v. Gilstrap*, 559 F.3d 1212, 1216 n.5 (11th Cir. 2009).

"A jailor's use of force against a pretrial detainee is excessive under the Fourteenth Amendment if it shocks the conscience."  *Fennell*, 559 F.3d at 1217 (internal quotes omitted).  "The use of force does not shock the conscience if it is applied in a good-faith effort to maintain or restore discipline."  *Id*. (internal quotes omitted).  "However, if the force is applied maliciously and sadistically to cause harm, then it does shock the conscience, and is excessive under the Eighth or Fourteenth Amendments."  *Id*. (internal quotes omitted).

"We consider the following factors in determining whether the force was applied maliciously and sadistically to cause harm, and thus violated the Fourteenth Amendment: a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the severity of a forceful response."  *Fennell*, 559 F.3d at 1217.  This listing was adopted by the Supreme Court in *Whitley v. Albers*, 475 U.S. 312, 321 (1986).  "When considering these factors, we give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance."  Fennell, 559 F.3d at 1217 (internal quotes omitted).  Moreover, "[w]e examine the facts as reasonably perceived by [the defendant] on the basis of the facts known to him at the time."  *Id*.

The evidence surrounding the April 12 application of force, construed most favorably to the plaintiff, is as follows.  Hall was scheduled for a court appearance in the morning, which required that he be moved to a holding cell (the "THC") for vehicular transport to the courthouse.  The correctional officers assigned to escort Hall to the THC found him naked.  They got him dressed and placed him in full restraints, meaning

handcuffs, leg irons and a belly chain.  Hall became resistant upon learning he was going to court.  As they moved along the hallway towards the THC, he spoke about the devil being out to get him and behaved erratically.  He fidgeted and tussled with the officers, tried to turn back towards his cell and repeatedly slid down the wall in an effort to sit, despite their orders to keep moving and their explanations that he was being transported to court.

The trio passed Stallworth's door.  Stallworth noticed the commotion, came into the hallway and followed.  When they reached the THC, Hall fought against entering it. Stallworth tased Hall's left buttock to get him to enter the THC, which he did.

Inside the THC, Hall continued to struggle.  Within seconds he was on the floor of the THC, where he can be seen on video[5] rolling, crawling or squirming manically for an extended period.  At one point, the door to the THC opened and Hall began to exit on the ground, feet first, before being pulled back inside.  After several minutes, Hall had moved to a portion of the THC that the video does not capture, but the ongoing commotion is observable from the motions of officers still in the video's sight and from the assortment of persons passing by the THC and pausing to watch through the window.  Hall continued to wriggle and squirm on the floor throughout his time in the THC.  He repeatedly broke free of the multiple officers attempting to restrain him by holding him and repeatedly crashed his head into the metal brackets supporting the room's metal benches.

While he struggled, Hall continued to talk and mumble wildly.  Stallworth, who was on the floor trying to restrain Hall by holding him about the torso, tried to reassure Hall that going to court was likely to lead to his release from jail.  But Hall insisted he did not want to go to court, then said something about wanting to die and mentioning the word "killing."  In response, Stallworth instructed an officer to summon medical assistance.  Dr. Smith, the staff psychiatrist, then arrived approximately 7:46 into the video, observed through the window but did not enter the THC.  For reasons that are not

_____

[5] A mounted video camera captured the action just outside the THC and, because the THC has a window and its door was sometimes open, some of the action inside.

explained, an additional four minutes passed before medical staff administered medication, which quickly quieted Hall.  About two minutes later, a gurney arrived to transport the now dying Hall.

Stallworth admits tasing Hall three times, but the plaintiff notes a report showing her taser was activated five times during the sequence, including twice before she and Hall entered the THC.  Love, who entered the THC about two minutes after Hall, admits tasing Hall one time, but the same report shows his taser was activated 13 times.[6]  Scott admits hitting Hall with a baton one time, and the plaintiff offers no evidence that he inflicted any different or additional force.

### 1.  Need for the application of force.

"Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding."  *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (internal quotes omitted).  In *Danley*, "the need for the use of force [was] established by the undisputed evidence that [the inmate] created a disturbance."  *Id*. (internal quotes omitted); *accord Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007).  All of the evidence here reflects that Hall created and maintained a disturbance by straining to break free of his escorting officers, by fighting against entering the THC, and by continuing to struggle throughout his time in the THC.  His conduct was not merely disruptive but threatening, initially to the officers and ultimately to himself.  These circumstances presented an unquestionable need for the application of force to restore order.

The plaintiff points to evidence of a standard protocol on the use of force, pursuant to which force should not be used until "soft touch," reason and verbal commands have

---

[6] The tasing outside the THC occurs at approximately 0:20 on the video and at 8:14:01 on Stallworth's taser record.  Love's taser record shows his first activation at 8:14:17.  Since he did not arrive in the THC until approximately two minutes after Stallworth, his first activation must have occurred at about 8:16:17 as measured by Stallworth's taser record.  Stallworth's last activation occurred at 8:18:19, or about 4:38 into the video.  Love's last activation occurred at 8:22:57 as measured by Stallworth's taser record, or about 9:16 into the video.

all been tried and failed.  (Doc. 113 at 28).  The plaintiff identifies no failure in this
regard, and he does not explain how any such failure could have mattered, given that
Hall's conduct was "motivated by irrationality," not rational reflection.  (*Id*. at 27).  There
is not the slightest reason to believe that more polite requests for cooperation might have
rendered Hall compliant, obviating resort to force. At any rate, regardless of any such
policy, from a constitutional perspective "prison guards do not have the luxury or
obligation to convince every inmate that their orders are reasonable and well-thought
out." *Danley*, 540 F.3d at 1307.

The plaintiff's only other argument is that, given Hall's irrationality, the use of
force against him was futile and thus unnecessary.  (Doc. 113 at 27-28).  The plaintiff
cites the testimony of other correctional officers that, based on their experience, mentally
disturbed persons do not respond to tasers, and he cites testimony from Stallworth and
Love indicating they realized Hall was mentally disturbed.  But the plaintiff offers no
evidence that Stallworth or Love realized, from training or experience, that their tasers
thus had no chance of making Hall compliant.[7]  Because the test for excessive force
against pretrial detainees is subjective, it is the mental state of the individual officers that
matters, based on the facts known to those officers at the time.  *Fennell*, 559 F.3d at
1217.  Without evidence the defendants knew their use of force was pointless, the
plaintiff's argument must fail.

---

[7] Love testified that he did not know what effect the taser would have on Hall.  (Love
Deposition at 34).  The plaintiff claims that Stallworth admitted knowing that the use of force on
mentally disturbed inmates was ineffectual, (Doc. 113 at 27-28), but none of his deposition cites
support that proposition.  The plaintiff notes that the jail had put on a training session 15 months
earlier entitled "Mental Illness Signs & Symptoms," (Doc. 113, Exhibit Q), but he offers no
evidence that Stallworth or Love attended or that the session went beyond its title and advised
attendees that the use of force against mentally disturbed persons is futile.

The plaintiff also ignores the uncontroverted evidence that at least the initial application
of force was perfectly effective, as it prompted Hall to end his resistance to entering the THC.

**2.  Relationship between the need for force and the amount of force applied.**

The plaintiff emphasizes that Hall was "tased" but does not acknowledge that Hall experienced only the milder of the two forces a taser is capable of delivering.  There is a "stark contrast between the prong mode (which overrides the central nervous system and disrupts muscle control) and the much less serious dry [or drive] stun mode (which results merely in pain, a burning sensation)."  *Hoyt v. Cooks*, 672 F.3d 972, 976 n.5 (11th Cir. 2012).  It is uncontroverted that only the drive stun mode was employed against Hall.  (Doc. 103, Attachment ¶¶ 134-41; Doc. 113, Attachment, ¶¶ 134-41).

The plaintiff also assumes that Hall was tased by Stallworth and Love a total of 18 times, on the grounds that their tasers were activated that many times.  But "an 'activation' of the Taser does not mean that the Taser actually touched or stunned" Hall.  *Hoyt*, 672 F.3d at 976.  In order to deliver pain, the taser must be "pressed against a person's body [when] the trigger is pulled."  *Id*. at 975 n.4.  The plaintiff identifies no evidence that each activation resulted in a drive-stun of Hall.

But suppose Hall was in fact tased, in drive-stun mode, 18 times over a nine-minute period.  Was that disproportionate to the need for force created by Hall's conduct?  Was it so disproportionate as to suggest a sadistic and malicious intent to harm him?

In *Mann v. Taser International, Inc*., 588 F.3d 1291 (11th Cir. 2009), the plaintiff's decedent was arrested on minor charges in the midst of an excited delirium episode, screaming about demons and devils that had stolen her treasure.  The arresting officers were informed that the arrestee had mental problems, was off her medication and needed help.  While handcuffed, the arrestee shouted accusations that the officers were trying to plant evidence on her, and she slammed her head against the patrol car trunk.  Once inside the patrol car, and despite wearing leg shackles, the arrestee continued to kick uncontrollably, shattering a window and bending the door frame, and she also slammed her head against the vehicle door.  The officers thereupon tased her three times (apparently in prong mode), to little effect, and she died of cardiac arrest within an hour.  *Id*. at 1299-1301.  The Eleventh Circuit ruled that the repeated tasings represented a reasonable use of force under the Fourth Amendment because the arrestee's conduct "was

violent, aggressive and prolonged" and because she "was clearly a danger to herself and others." *Id*. at 1306.

Because it was decided under the Fourth Amendment, where the test is one of objective reasonableness rather than subjective intent to harm, *Mann* is not controlling here, but it strongly supports the proposition that the tasing of Hall was not so disproportionate to the need for force as to suggest the defendants acted sadistically and maliciously. Like Hall, the arrestee in *Mann* threatened serious harm to herself by slamming her head into hard objects. As with Hall, her physical exertions also could have harmed law enforcement officers.[8] Like Hall, she was restrained with handcuffs and leg restraints. Like Hall, she acted mentally disturbed, and like Stallworth and Love, the arresting officers recognized it. And like Hall, the arrestee in *Mann* was experiencing excited delirium. Yet despite her restraints and confinement in a secure vehicle, and despite her mental issues, the Eleventh Circuit found it reasonable to tase her in prong mode and to keep doing so when the initial effort had no effect. The plaintiff does not acknowledge *Mann* or attempt to explain why it is not devastating to his case.

Instead, the plaintiff argues the second *Whitley* factor weighs in his favor because: (a) Hall was in physical restraints; (b) for most of the episode, he was lying on the floor; and (c) he was doing nothing more than trying to crawl away from Stallworth. (Doc. 113 at 29). "When jailers continue to use substantial force against a prisoner who has clearly stopped resisting – whether because he has decided to become compliant, he has been subdued, or he is otherwise incapacitated – that use of force is excessive." *Danley*, 540 F.3d at 1309. Hall, however, did not at any time during the episode become compliant. That he was in physical restraints limited how he could resist, but it did not stop him from resisting, as the factual summary recited above makes clear. His time on the floor was not spent resting but violently wrenching away from the multiple officers trying

---

[8] Before being placed in the squad car, the arrestee had flailed about in an effort to hit, kick and head butt the officers. 588 F.3d at 1300.

unsuccessfully to restrain him.  And Hall was not merely seeking solitude but was, as the plaintiff puts it, "banging his head" on the metal benches.  (Doc. 113 at 30).

The plaintiff insists that, regardless of how proportionate the use of force may have appeared initially, at some point Stallworth and Love must have realized the tasers were not quieting Hall, at which point further tasings were disproportionate.  (Doc. 113 at 29).  But Hall, it must be remembered, was repeatedly "banging his head" against unyielding metal, (*id*. at 30), moving so violently that multiple officers could not keep him from doing so.  Faced with an ongoing risk that Hall would inflict brain injury or even death on himself, and unable to immobilize him with their body strength alone, the defendants' continued use of tasers in the low, drive-stun mode remained proportionate to the threat throughout the episode.  The plaintiff's bizarre suggestion that Stallworth and Love should have let Hall keep striking his head rather than add to his discomfort the drive-stun mode's mild force, (*id*. at 29), is as unsupported as it is insupportable.[9]

Other than the tasers, the plaintiff identifies only a single application of force: Scott's striking Hall one time with a retractable baton.  It is uncontroverted that Scott did so only because Hall had grabbed Love by the arm and refused to release him.  (Doc. 103, Attachment 1, ¶ 123; Doc. 113, Attachment 1, ¶ 123).  The plaintiff makes no argument that this application of force was disproportionate to the need.

### 3. Extent of the injury inflicted.

In his ten-word argument in support of this factor, the plaintiff identifies Hall's injuries as multiple taser burns and bruises, followed by death.  (Doc. 113 at 29).[10]  He does not pause to identify his evidence of burns and bruises, but the Court assumes he relies on the autopsy report, which documents about 30 abrasions, over a dozen

---

[9] There is no evidence that Stallworth delayed in summoning medical assistance.  As discussed *infra* note 15, she requested such help within five minutes after entering the THC.

[10] The plaintiff does not claim any injury from being struck by Scott's baton, presumably because his own witness could find no evidence of blunt-force injury.  (Sheffield Deposition at 28).

contusions, and 14 "areas" or "clusters" of them.  (Doc. 113, Exhibit W at 2-3).  The Court assumes that the plaintiff uses the term "burns" to refer to abrasions and the term "bruises" to refer to contusions.

Neither the autopsy report nor any submitted deposition testimony pointed out to the Court ties any particular abrasion or contusion to the April 12 incident.  Indeed, the plaintiff's own witness cannot say how many of these insults predated Hall's arrest.  (Sheffield Deposition at 34-35).  And at least some of them plainly were inflicted by Hall himself in the course of his violent flinging of his body against immovable objects, both on April 12 and earlier.[11]

Nor has the plaintiff offered evidence of the sort of injury that a taser deployed in drive-stun mode may inflict.  A review of published cases indicates that burn marks are predictable, but not bruises.[12]  Against the plaintiff's evidentiary vacuum, the most injury that can be attributed to the April 12 incident – and this is generous – is 18 abrasions, one for each taser activation.

The plaintiff calls them burns, but his medical expert calls them abrasions.  Some abrasions can penetrate beyond the epidermis, but the autopsy report does not indicate that any did so in Hall's case; the plaintiff's witness calls them merely "superficial trauma."  (Sheffield Deposition at 28).  Most of the abrasions were ¼-inch in dimension, and only four (which have not been linked to the April 12 incident) exceeded one inch.  (Doc. 113, Exhibit W at 2-3).  These injuries are no more serious than those in *Danley*, which found the use of pepper spray not to support the third *Whitley* factor.  "Pepper spray is designed to disable a suspect without causing permanent physical injury.  ...  Any injuries or discomfort Danley suffered as a necessary result of a dose of pepper spray were neither substantial nor long lasting."  540 F.3d at 1308 (internal quotes omitted).

Death, in contrast, is the ultimate injury.  The problem for the plaintiff is that he has not the tiniest sliver of evidence that Stallworth, Love or Scott intended to kill Hall or

---

[11] Stallworth, for example, observed marks and bruises on Hall immediately prior to the April 12 incident.  (Stallworth Deposition at 71).

[12] *E.g., Marquez v. City of Phoenix*, 693 F.3d 1167, 1171 (11th Cir. 2012).

had the slightest idea that their modest application of force would or even could work such a devastating result.  While the extent of injury is to be considered under *Whitley*, "the core judicial inquiry … [is] not whether a certain quantum of injury was sustained but rather whether force was applied … maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 130 S. Ct. 1175, 1178 (2010) (internal quotes omitted). Degree of injury is relevant only to the extent it reflects on the mental state of the defendant to restore discipline or to cause harm.  When, as here, the injury received is wholly disproportionate to what the defendants could reasonably expect, it does not aid the plaintiff's cause.  *Cockrell*, 510 F.3d at 1311 ("There is no way that Deputy King could have foreseen that a simple push would result in as much injury as Cockrell unfortunately suffered.  That the severity of the injury could not have been reasonably anticipated makes it less likely that King acted maliciously and sadistically for the very purpose of causing harm.") (internal quotes omitted); *Fennell*, 559 F.3d at 1219 ("As extensive as Fennell's injuries are, we have held [in *Cockrell*] that this may be outweighed by the officer's inability to reasonably anticipate the severity of the injury."). The plaintiff has proffered no evidence that Stallworth, Love or Scott knew or should have known:  that Hall was experiencing excited delirium; that this condition could trigger arrhythmia and cardiac arrest; that Hall had an enlarged heart and coronary blockages that raised the chances of such a result, (Turner Deposition at 26); or that his excited delirium (and thus his chances of dying) would or could be exacerbated by their applications of force.

### 4.  Extent of the threat.

The plaintiff points to evidence that Hall posed no risk of escape and, at some point, ceased to be a threat to the officers.  (Doc. 113 at 29-30).  The relevant threats, however, include threats to inmates.  Hall was an inmate, and force can be employed to prevent an inmate from harming himself.  *E.g., Nasseri v. City of Athens*, 373 Fed. Appx. 15, 19 (11th Cir. 2010) (Fourteenth Amendment violation occurred where the plaintiff "was not posing a threat to himself"); *cf. Vinyard v. Wilson*, 311 F.3d 1340, 1347-48 (11th

14

Cir. 2002) (in the Fourth Amendment arrest context, in which the court is to consider the "threat to the safety of the officers or others," the relevant threat includes the arrestee's "threat to … herself") (internal quotes omitted); *Mann*, 588 F.3d at 1306 (same). Hall's wild thrashings, during which he repeatedly struck his head against hard metal, posed a continuing threat to himself, and the danger of permanent brain injury or even death plainly outweighed the minor injury to be expected from the use of tasers in the drive-stun mode.

Nor is the existence of a physical threat an absolute prerequisite to the permissible use of force. In *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990), for example, the plaintiff was in his cell demanding to go to the gym when the defendants ordered him out of his cell and applied force. *Id*. at 1530-31. The Court ruled that the plaintiff had "created a disturbance," which permitted the use of force, *id*. at 1533, even though the locked-up plaintiff posed a threat to no one. *See also Fennell*, 559 F.3d at 1218 (discussing *Bennett*).

### 5. Efforts to temper the severity of the response.

"This factor allows the court to take into account efforts by the police to mitigate the effects of the force that was applied." *Fennell*, 559 F.3d at 1220. For example, "[t]he immediate offer of medical assistance demonstrates an effort to temper the severity of the response." *Ledlow v. Givens*, 500 Fed. Appx. 910, 913 (11th Cir. 2012). As noted, Stallworth summoned medical assistance even while still dealing with Hall's violent behavior.

Apparently unaware of the focus of this factor, the plaintiff argues that Stallworth and Love did not temper their response because they did not stop tasing Hall soon enough. (Doc. 113 at 30). This is not the factor under which to consider such things but, in any event, the argument fails just as it did under the first two *Whitley* factors.

It is worth noting that Stallworth and Love did in fact temper their response in the way the plaintiff intends. In the first place, they employed tasers only in the "much less

serious" drive-stun mode,[13] not in the prong mode.  In the second place, they did not discharge their tasers continuously; in the approximately nine minutes between the first and last discharge, Stallworth's and Love's tasers activated a total of 1:18, with no activation longer than seven seconds and only two longer than five seconds.  (Doc. 113, Exhibit B).[14]  In the third place, they did not rely exclusively on their tasers but, as the video reflects, spent most of the period trying unsuccessfully to restrain Hall by holding his legs and torso.  (Stallworth Deposition at 81, 106).  In the fourth place, Stallworth summoned medical assistance early in the episode, and only the delay in receiving such assistance required a continuation of the application of force.[15]

### 6.  Summary.

"In the absence of evidence that [the defendant] acted maliciously and sadistically, [his] use of force does not shock the conscience, and thus did not violate the Fourteenth Amendment."  *Fennell*, 559 F.3d at 1220.  The same is so in this case. Because there is no genuine issue of material fact as to whether Stallworth, Love and Scott applied force maliciously and sadistically, they are entitled to summary judgment as to this claim.

---

[13] *Hoyt*, 672 F.3d at 976 n.5.

[14] Since, as noted in Part I.B.2, activation is not synonymous with a strike, the total time during which pain was actually administered is probably shorter.

[15] Stallworth directed Corporal Packer to summon medical assistance.  (Stallworth Deposition at 81).  Packer is seen leaving the THC at 5:49 on the video, or barely five minutes after Hall entered the THC.  Packer summoned Nurse Walton, who came to the THC, observed the situation, and then went to advise Dr. Smith.  (Doc. 113, Exhibit A at 24, 26).  Dr. Smith arrived 7:46 into the video, and medication was administered approximately four minutes later. At least seven of the 18 activations of which the plaintiff complains occurred during the six minutes between Stallworth's request for help and its provision.

## II.  Deliberate Indifference.

Although all of the Correctional Officer defendants are named in Count Two, the plaintiff has limited the claim to one against Turner, the shift commander from 7:00 Sunday evening to 7:00 Monday morning.  (Doc. 113 at 32-34).  Accordingly, the other five defendants are entitled to summary judgment as to this claim.

In his principal brief, Turner expressly limits his abatement argument to the plaintiff's claims for excessive force and assault and battery.[16]  In his reply brief, he argues for the first time that the deliberate indifference claim also abates.  (Doc. 122 at 3).  "District courts, including this one, ordinarily do not consider arguments raised for the first time on reply."  *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1330 n.8 (S.D. Ala. 2012) (citing cases and explaining the underlying rationale).  Turner offers no reason the Court should depart from this well-established rule, and the Court declines to do so.

"To prevail on a deliberate indifference to serious medical need claim, Plaintiffs must show:  (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury."  *Mann*, 588 F.3d at 1306-07.  Turner argues that the plaintiff cannot satisfy any of these elements.

### A. Serious Medical Need.

"A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Mann*, 588 F.3d at 1307 (internal quotes omitted).  "In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition."  *Id*.  "In either case, the medical need must be one that, if left unattended, poses a substantial risk of serious harm."  *Id*. (internal quotes

---

[16] (Doc. 103 at 7 (discussion under the heading, "a. Excessive Force Claims Abate"); *id*. at 7-8 ("[T]he court must first determine whether any of the claims for excessive force survive Hall's death."); *id*. at 9 ("Therefore, all claims brought pursuant to 42 U.S.C. § 1983 for excessive force, as well as all state law claims for assault and battery should be dismissed."")).

omitted).  "[I]n this circuit, it is established that psychiatric needs can constitute serious medical needs . …"  *Steele v. Shah*, 87 F.3d 1266, 1269 (11th Cir. 1996).

Turner argues that Hall's mental condition did not constitute a serious medical need because no physician had diagnosed it and a lay person would not easily have recognized the need for medical attention.  (Doc. 103 at 15).  Clearly there was no existing physician's diagnosis, but how difficult would it have been to recognize that Hall needed psychiatric help?  All Turner argues is that being naked, talking to God, and assaulting correctional officers would not raise an eyebrow in a jail setting, (*id.*), but this is not everything that Hall did.  There is evidence that various correctional officers also witnessed Hall:  crying on his hands and knees; hallucinating; staring vacantly; growling; thinking he was God; ranting about angels and demons; refusing to dress because his uniform smelled of smoke and would prevent the angels from reaching him; saying that God forbade him to dress because Jesus Christ was speaking to him; announcing that he was going to see Jesus in a few minutes; hitting his head on a wall; and brushing off multiple tasings with no apparent effect.  (Doc. 115 at 9-11).  At least nine correctional officers recognized that Hall was mentally disturbed, delusional, psychotic and/or crazy. (*Id.*).

Turner cannot prevail on his argument without addressing this mountain of evidence, yet he ignores it.  He ignores as well the alternate measure of a serious medical need, i.e., the effect of delay on the condition.  Turner's superficial treatment is inadequate to demonstrate his right to summary judgment on this ground.

### B.  Deliberate Indifference.

In order to satisfy this element, a plaintiff  "must show:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that is more than mere negligence."  *Mann*, 588 F.3d at 1307 (internal quotes omitted).

1.  **Subjective knowledge.**

To satisfy the first prong of the second element, the degree of risk must be "substantial." *E.g., Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011).  In order to have subjective knowledge, the defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Rodriguez v. Secretary for Department of Corrections*, 508 F.3d 611, 617 (11th Cir. 2007) (internal quotes omitted).  "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual Defendant must be judged separately and on the basis of what that person knows." *Harper v. Lawrence County*, 592 F.2d 1227, 1234 (11th Cir. 2010) (internal quotes omitted).

Turner does not deny that he was aware of facts from which the inference could be drawn that Hall faced a substantial risk of serious harm.  In a single, unexplained half-sentence, he posits that he had no "subjective knowledge of such serious medical need." (Doc. 103 at 16).  Assuming without deciding that Turner, despite not saying so, should be credited with asserting he lacked subjective knowledge of a substantial risk of serious harm to Hall, his failure to support the argument in any fashion requires its rejection.

A defendant's subjective awareness of a substantial risk of serious harm is "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007) (internal quotes omitted).  The plaintiff has presented evidence that Turner knew on Sunday:  that Hall had assaulted a correctional officer the previous night; that he had been combative, uncooperative and hyper during that episode; that he was acting crazy in his cell on Sunday afternoon, moving around waving his hands and saying he could not put on a prison uniform because it smelled of smoke and the angels could not get to him; that it took five officers to get Hall dressed and moved to another cell; that Hall refused to wear handcuffs and became combative in the process; that, when the officers took him to the floor, he kicked, screamed, and tried to swing his fist at the

officers; that he was tased (drive-stun mode) several times with no effect; and that, after the move, he again stripped naked and began hitting his head against the wall while talking about God.  (Doc. 113, Exhibit C; *id.*, Exhibit A at 16; Harris Deposition at 21-22; Byrd Deposition at 36-38-39, 42, 58-59; Turner Deposition at 74-75).  The danger that Hall, with his chronic violence and erratic behavior, would suffer serious harm from banging his head against the wall of his cell (conduct that Turner witnessed) would seem obvious.  *See Thomas v. Bryant*, 614 F.3d 1288, 1300-01, 1309, 1316 (11th Cir. 2010) (inmate suffered "serious head injuries" requiring emergency room treatment from banging his head on his steel bunk and cell door, which conduct constituted "self-injurious behavior" reflecting that he was "at risk for … self-injury").  Without addressing this evidence and its implications, which Turner fails to do, he cannot receive summary judgment on this ground.

## 2. Disregard of the risk.

One "disregards that risk [of serious harm] by failing to take reasonable measures to abate it."  *Chandler v. Crosby*, 379 F.3d 1278, 1296 (11th Cir. 2004) (internal quotes omitted); *accord Harper*, 592 F.3d at 1235.  The plaintiff's theory is that Turner was aware of Hall's odd behavior but failed to notify either the mental health staff or Stallworth (who relieved him on the morning of April 12).  (Doc. 113 at 32-34).  That is, the plaintiff alleges that Turner failed to take the reasonable measure of reporting to these persons what he knew about Hall.

Turner argues he did not disregard a risk of serious harm to Hall, because Hall was seen by health care providers five times while incarcerated and was scheduled to see a psychiatrist on Monday.  (Doc. 103 at 16).  This would appear to be a non sequitur, since the conduct of others is not the conduct of Turner.  Perhaps he means to say that doing nothing was a reasonable measure to abate the danger to Hall because Hall was already being cared for.  Even with this favorable construction of his argument, Turner has not shown that he was aware of all these visits.

First, Turner has identified no evidence that he was aware Hall had been seen by two nurses (once after his Saturday night altercation and another after his Sunday afternoon altercation). Nor has he shown his awareness that Hall was scheduled to see Dr. Smith on Monday. He certainly could not have been aware on Sunday that a nurse would be summoned to the THC on Monday morning after Stallworth requested assistance.

That leaves Turner to rely on Marcia Joiner, a social worker/counselor/therapist who was the only mental health staff on duty that Sunday. There is uncontroverted evidence that Turner knew Joiner had interviewed Hall on Sunday morning, determined he was not suicidal, and ordered that he be moved from the suicide wing to the administrative segregation wing. (Turner Deposition at 67-68). Turner says he was also aware that Joiner saw Hall again on Sunday afternoon, after the move and while Hall was hitting his head on the wall and talking about God. (Doc. 113, Exhibit A at 16). But Joiner denies having met with Turner after Sunday morning. (Joiner I Deposition at 47-48). On motion for summary judgment, the Court must credit the version most favorable to the plaintiff, which means for present purposes that Turner could not have been aware of a non-existent second visit by Joiner.

 It was probably reasonable for Turner not to tell Joiner what he knew of Hall's conduct Saturday night, since he knew that Joiner had interviewed Hall on Sunday morning. But, given Turner's subjective awareness that Hall presented a substantial risk of serious harm to himself, it is doubtful that his awareness of Joiner's Sunday morning interview of Hall would have rendered it reasonable not to inform her of Hall's subsequent conduct on Sunday afternoon, which included all of the following: acting crazy; refusing to dress because it would interfere with the angels getting to him; fighting five correctional officers at once; being repeatedly tased with no effect; stripping again after the move; and beating his head against the wall while talking about God. This is the very conduct that created the serious risk of substantial harm, and Turner has not even argued, much less shown, that Joiner would be aware of this conduct even if not informed

by the correctional staff.  Without addressing the matter, which Turner does not do, he cannot obtain summary judgment on this ground.

### 3.  Culpability.

Turner's only argument as to this portion of the second element is that his awareness that Joiner had seen Hall on Sunday afternoon when he was hitting his head on the wall negates any culpable mental state.  (Doc. 122 at 3-4). As discussed above, however, there is evidence that Joiner did not see Hall on Sunday afternoon.  Thus collapses the predicate of Turner's argument, such that he cannot obtain summary judgment on this ground.[17]

### C.  Causation.

Turner offers only his one-sentence ipse dixit that "[t]here is no evidence that any action or omission on [his] part … caused  Hall's death."  (Doc. 103 at 16).  Under *Celotex*, Turner cannot shift the burden to the plaintiff simply by denying he can prove his claim; instead, Turner must point to evidence either negating his causal connection to Hall's death or reflecting the plaintiff's inability to establish such causation.[18]  Turner's one-liner accomplishes neither and thus cannot sustain his argument.

---

[17] Turner insists he had the "right to rely on medical professionals for clinical determinations." *Howell v. Evans*, 922 F.2d 712, 723 (11th Cir.) (emphasis omitted), *vacated*, 931 F.2d 711 (11th Cir. 1991), *reinstated*, 12 F.3d 190, 190 n.* (11th Cir. 1994); *see also Williams v. Limestone County*, 198 Fed. Appx. 893, 897 (11th Cir. 2006) ("Finally, supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care.").  But he has not shown that he had a right to leave Joiner ignorant of the symptoms on which she would base any clinical determination.

[18] *See Clark*, 929 F.2d at 608 ("Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."); *cf. Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) (on appeal, "[a] passing reference to an issue in a brief is not enough, and the failure to make arguments and cite authorities in support of an issue waives it").

**D.  Qualified Immunity.**

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Turner invokes this qualified immunity.  (Doc. 103 at 16-18).

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right."  *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ...  If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law."  *Harbert International*, 157 F.3d at 1281 (emphasis added).  The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application."  *Id.*

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted).  For this inquiry, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize."  *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

The first prong of this test requires that the defendant "have been performing a function that, but for the alleged unconstitutional infirmity, would have fallen within his

legitimate job description." *Holloman*, 370 F.3d at 1266 (emphasis omitted). "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert International*, 157 F.3d at 1282 (internal quotes omitted).[19]

As for the second prong, "[e]ach government employee is given only a certain 'arsenal' of powers with which to accomplish her goals." *Holloman*, 370 F.3d at 1267. "Pursuing a job-related goal through means that fall outside the range of discretion that comes with an employee's job is not protected by qualified immunity." *Id*.

"[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Roberts v. Spielman*, 643 F.3d 899, 903 (11th Cir. 2011) (internal quotes omitted). The Court must "interpre[t] the evidence in the light most favorable to the plaintiff." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010). The quantum and quality of evidence necessary to meet the defendant's burden "vary in proportion to the degree of discretion inherent in the defendant's office," *Harbert International*, 157 F.3d at 1282 (internal quotes omitted), but ordinarily "there must be a showing by competent summary judgment materials of objective circumstances that would compel th[e] conclusion" that the defendant acted within his discretionary authority. *Id*. (internal quotes omitted). Certainly "[a] bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice" to meet the defendant's burden of proof. *Id*. (internal quotes omitted).

Turner's challenged conduct is his failure to notify Joiner or Stallworth about Hall's conduct. That is an omission rather than an act, but Turner meets his burden by

---

[19] For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners. *Harbert International*, 157 F.3d at 1282 (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

showing that the omission "occurred while he was engaged in a discretionary duty." *Goebert*, 510 F.3d at 1329.

Turner says he was carrying out his duties as a jailer and therefore acting within his discretionary authority. (Doc. 103 at 17). The plaintiff himself insists – with appropriate evidentiary support – that Turner's employer placed on him a duty to report aberrant inmate behavior both to mental health staff and to the officer relieving him. (Doc. 113 at 32, 33). Turner's omission of that duty thus fell within his discretionary authority for purposes of the qualified immunity analysis. *See, e.g., Gullett v. Waugh*, 2012 WL 6929166 at *2, *6 (S.D. Ala. 2012) (where the defendants had some employment responsibility to provide safe jail conditions, their failures to act to safeguard the plaintiff's safety were within the scope of their discretionary authority); *Jackson v. Kile*, 2007 WL 2570776 at *1, *5 (S.D. Ga. 2007) (where it was the sheriff's decision whether to grant or deny the plaintiff's request for additional medical care, his failure to approve such care was an omission within his discretionary authority).[20]

Because Turner has carried his threshold burden, the burden shifts to the plaintiff to show that Turner's conduct "violated a clearly established statutory or constitutional right." *Grayden*, 345 F.3d at 1231. The inquiry may be broken down into two parts: (1) whether the facts alleged, if true, would establish a violation of Hall's rights; and (2) whether those rights were clearly established at the time of the alleged deprivation. *Id.* Assuming without deciding that the discussion in Parts II.A-C satisfy the first prong, the plaintiff has not satisfied the second.

To be clearly established, "pre-existing law must dictate, that is truly compel (not just suggest or allow or raise a question about), the conclusion for every like situated reasonable government agent that what the defendant is doing violates federal law in the

---

[20] Because "discretionary authority," for the peculiar purposes of qualified immunity, extends to "purely ministerial activities," *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004), it does not matter that Turner may have possessed no discretion not to report Hall's conduct. *Accord McCoy v. Webster*, 47 F.3d 404, 407 (11th Cir. 1995) ("In *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994), we interpreted the term 'discretionary authority' to include actions that do not necessarily involve an element of choice.").

circumstances." *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The law is clearly established if any of three situations exists. "First, the words of the pertinent federal statute or constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the total absence of case law." *Vinyard*, 311 F.3d at 1350 (emphasis omitted). "Second, ... some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Id*. at 1351. "Third, [when] the Supreme Court or we, or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances,'" then if "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar [to those involved in the opinion], the precedent can clearly establish the applicable law." *Id*. at 1351-52.

The plaintiff does not assert that Turner violated clearly established law under these tests or any other. Because the burden is on the plaintiff, his silence is necessarily fatal, and Turner is entitled to qualified immunity.

"Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory or injunctive relief." *Ratliff v. DeKalb County*, 62 F.3d 338, 340 n.4 (11th Cir. 1995). The complaint, however, seeks only monetary relief. (Doc. 1 at 28-29). Qualified immunity thus provides Turner a complete defense.

### III. State Claims.

The circumstances supporting these claims extend no further than those advanced in favor of the federal claims. Thus, to the extent Counts Four and Five are based on the use of force on April 11 by Turner, Houston and Robinson, they are abated for reasons

addressed in Part I.A.  This leaves for consideration only the April 12 use of force by Stallworth, Love and Scott (which is asserted both as negligence and as assault and battery) and Turner's failure to notify others of Hall's behavior (which is asserted as negligence).  (Doc. 1 at 17-18).

The defendants' only substantive argument is the one-sentence assertion that "there has been no evidence presented that any of the Corrections Officers' action[s] caused the death of Mr. Hall."  (Doc. 103 at 20).  As discussed in Part I.A, the plaintiff does in fact have evidence that the April 12 use of force contributed to Hall's death.  And as discussed in Part II.C, Turner's ipse dixit fails to satisfy his initial burden on motion for summary judgment.

The defendants' only other arguments concern immunity, of two types: sheriff immunity and state-agent immunity.  (Doc. 103 at 18-20).  The Court considers these in turn.

### A. Sheriff Immunity.

The defendants argue they are immune pursuant to Sections 14-6-1 and 36-22-3 of the Alabama Code.  (Doc. 103 at 18-19).  Amendments to these provisions provide that jailers partake of their employing sheriff's immunity "as long as [they are] acting within the line and scope of [their] duties and [are] acting in compliance with the law."  The amendments were passed in 2011 – before suit was filed but after the defendants' conduct occurred.  The threshold question is thus whether the amendments apply in this case.  A second question is whether the defendants "act[ed] in compliance with the law."

### 1. Retroactivity.

As best the Court can determine, the Alabama courts have not resolved the retroactivity issue posed by the 2011 amendments.  The plaintiff cites *Ex parte Burnell*, 90 So. 3d 708 (Ala. 2012), but the Court does not find it dispositive.  In *Burnell*, the Supreme Court dropped a footnote stating that "[t]he 2011 amendments are not

27

applicable in this case," *id*. at 714 n.2, but the statement is unexplained, ambiguous[21] and dicta.[22]  The Court is aware that two sister Courts have construed *Burnell* "'to mean that the recently-enacted immunity amendments do not apply to conduct which occurred before their effective date,'"[23] but the Court believes that further investigation is required.

"Retrospective application of an act is disfavored unless 1) the act expressly states that it is to be applied retrospectively; 2) the Legislature clearly intended the act to have retrospective application; or 3) the act is of a remedial nature."  *Ex parte East Alabama Health Care Authority*, 814 So. 2d 260, 262 (Ala. 2001).  The Correctional Officer defendants concede the first two circumstances do not exist, but they argue the 2011 amendments are remedial in nature.  (Doc. 103 at 18-19).

Remedial statutes are "those which do not create, enlarge, diminish, or destroy vested rights."  *East Alabama*, 814 So. 2d at 262; *accord Street v. City of Anniston*, 381 So. 2d 26, 29 (Ala. 1980) ("'Remedial statutes' … do not create new rights or take away vested ones ….").  "Remedial statutes are exemplified by those that impair no contract or vested right, … but preserve and enforce the right and heal defects in existing laws prescribing remedies."  *Ex parte Bonner*, 676 So. 2d 925, 926 (Ala. 1995) (internal quotes omitted).  Remedial statutes are those that affect procedural rights or, more precisely, *only* procedural rights.  *Alabama Insurance Guaranty Association v. Mercy Medical Association*, ___ So. 3d ___, 2013 WL 563412 at *4 (Ala. 2013); *East Alabama*, 814 So. 2d at 862 (remedial statutes "addres[s] procedure only") (internal quotes omitted).  On the flip side, substantive statutes "are those that create, enlarge, diminish,

---

[21] Since suit in *Burnell* was brought before the amendments were passed, *see* 90 So. 3d at 709, the Court may have considered the amendments inapplicable on that basis rather than because the underlying conduct preceded the amendments.

[22] The Court ruled that the defendant possessed constitutional immunity, 90 So. 3d at 710, 715, rendering any discussion of statutory immunity unnecessary to the decision.  *E.g., Ex parte Patton*, 77 So. 3d 591, 596 (Ala. 2011) (language not essential to the holding is dicta).

[23] *Kruse v. Byrne*, 2012 WL 5469801 at *11 (S.D. Ala.), *report and recommendation adopted*, 2012 WL 5470604 (S.D. Ala. 2012) (quoting *Johnson v. Conner*, 2012 WL 3962012 at *6 (M.D. Ala. 2012)).

or destroy vested rights" and are not retroactive unless the legislature so provides. *Mercy Medical*, 2013 WL 563412 at *4.

Using these definitions, it is difficult to imagine how a statute creating a new immunity from suit could possibly be viewed as remedial and not substantive. Perhaps this is most easily seen by considering the opposite scenario. Suppose jailers possessed statutory immunity in 2010 but, in 2011, the Alabama Legislature abolished that immunity. Would the Correctional Officer defendants agree that the legislature had effectively stripped them of their immunity after they engaged in the conduct for which they were then immune? They would certainly insist that, in 2010, they possessed a vested right in immunity for their 2010 conduct and that a later statute destroying that vested right could not be remedial so as to apply retroactively. And they would be correct.[24]

But what is sauce for the goose is sauce for the gander. A statute creating a new immunity creates a new vested right in jailers and simultaneously destroys the plaintiff's vested right in his cause of action against the jailers. This is precisely the sort of legal change that cannot apply retroactively without express or obvious legislative approval.[25]

The Alabama Supreme Court hinted at this result in *Slagle v. Parker*, 370 So. 2d 947 (Ala. 1979). There, the plaintiffs complained that the legislature had created an immunity in favor of co-employees sued for wrongful death. The Court ruled that, since the plaintiffs' causes of action arose after the legislature acted, they had no "vested right" in the previous regime that could implicate due process concerns. *Id*. at 949-50. The

---

[24] *See Myers v. Philip Morris Companies, Inc.*, 50 P.3d 751, 758 (Cal. 2002) (repeal of statutory immunity could not apply retroactively absent express legislative intent); *Moshe v. Anchor Organization*, 557 N.E.2d 451, 460 (Ill. App. 1990) (statutory elimination of immunity created new rights and obligations, was thus substantive, and therefore could not be applied retroactively without express or obvious legislative intent).

[25] *Cf. Rupp v. Bryant*, 417 So. 2d 658, 660-61, 665-66 (Fla. 1982) (the plaintiff had a vested right to sue a defendant unprotected by immunity, which right could not be taken away by retroactive legislation granting immunity; given due process concerns, even express legislative intent for retroactive application was insufficient).

implication, at least, is that they would have had a vested right to sue the co-employees free of immunity concerns had their decedents died before the immunity was created.

This is consistent with the interpretation of the constitutional guarantee that "every person, for any injury done him, … shall have a remedy by due process of law …."  Ala. Const. art. I, § 13.  The decisions construing Section 13 have followed a "vested rights" approach, under which plaintiffs obtain a vested right in a cause of action when that cause of action accrues.  *E.g., Baugher v. Beaver Construction Co.*, 791 So. 2d 932, 934 (Ala. 2000).  There is no reason to believe that the term "vested rights" carries a different meaning for purposes of retroactivity than it does for purposes of Section 13.  The plaintiff's cause of action unquestionably accrued in April 2010, when the challenged conduct occurred and Hall died.

Statutes altering the limitations period are considered remedial, such that an amendment shortening the relevant period applies to causes of action that accrued before the amendment.  *Foster v. Hacienda Nirvana, Inc.*, 32 So. 3d 1256, 1259-60 (Ala. 2009); *accord Street*, 381 So. 2d at 29.  But the legislature cannot thereby cut off a plaintiff's existing right to sue; instead, it must provide a reasonable time for existing causes of action to be brought.  *Id*.  The reason, though unstated, presumably is that the plaintiff has a vested right to sue on state claims once his cause of action accrues, which right cannot be destroyed by retroactive legislation.  Similarly, the plaintiff in 2010 had a vested right to sue the Correctional Officer defendants on state claims, which right would be destroyed by retroactive immunity.

The Correctional Officer defendants do not apply the key legal principles or come to grips with their implications.  Instead, they simply cite an unpublished Wisconsin case for the proposition that "[a] statute enacted to lessen liability is remedial in nature." (Doc. 103 at 19).  The case does not stand for exactly that proposition, it was not addressing the test for retroactivity in any event, and it is neither a product of, nor endorsed by, the Alabama courts.  It is, in a word, irrelevant.

The Court's task is to predict how the state's highest court would answer the retroactivity issue and to apply that predicted response.  *E.g., Molinos Valles del Cibao,*

*C. por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).  For the reasons expressed above, the Court predicts that the Alabama Supreme Court would not apply the 2011 amendments retroactively to conduct predating the amendments.

### 2.  Action in Compliance with the Law.

Even had the Correctional Officer defendants shown that the 2011 amendments apply retroactively to their conduct, they have not attempted to show they were "acting in compliance with the law," as that immunity demands.[26]  Their failure might be excusable if the burden lay with the plaintiff to demonstrate the negative rather than with the defendants to demonstrate the affirmative, but the defendants have not articulated even that burden-shifting argument and have thus left the burden on themselves.  Their silence is necessarily inadequate to meet that burden.

### 3.  Summary.

Because the 2011 amendments do not apply retroactively, and because the Correctional Officer defendants have not shown the statute to be satisfied in any event, they are not entitled to immunity under those amendments.

### B.  State-Agent Immunity.

The Correctional Officer defendants argue they are entitled to state-agent immunity under *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000).  (Doc. 103 at 19-20).

"A State agent asserting State-agent immunity bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity."  *Ex parte City of Montgomery*, 99 So. 3d 282, 293 (Ala. 2012) (internal quotes omitted).  "Should the State agent make such a showing, the burden then shifts to

---

[26] The Alabama Supreme Court has declined to answer a certified question seeking guidance on how to interpret this phrase, leaving its import unclear.  *Sawyer v. Collins*, ___ So. 3d ___, 2013 WL 2278608 (Ala. 2013).

the plaintiff to show that one of the two categories of exceptions to State-agent immunity … is applicable." *Id*. (internal quotes omitted).

### 1. State agent.

The threshold question is whether the Correctional Officer defendants are state agents.  The *Cranman* test applies to "State employees sued in their individual capacities." *Ex parte Butts*, 775 So. 2d 173, 177 (Ala. 2000); *accord Ex parte Fielding*, 86 So. 3d 354, 359 n.2 (Ala. 2011).  So, if a defendant is a state employee, he or she is also a state agent for purposes of state-agent immunity.

A sheriff is a state officer.  Ala. Const. art. V, § 112; *Parker v. Amerson*, 519 So. 2d 442, 443, 446 (Ala. 1987).  "Since the sheriff is a state officer by virtue of [Section 112], deputy sheriffs are likewise considered state employees." *Etowah County Commission v. Grant*, 10 So. 3d 1009, 1012 (Ala. Civ. App. 2007).  Other persons hired by the sheriff are also considered state agents for purposes of immunity.  *See Wilson v. Manning*, 880 So. 2d 1101, 1108-09 (Ala. 2003) (applying *Cranman* to a defendant working for a sheriff's department as the jail's director of nursing).  The sheriff appoints a jailer and other jail personnel,[27] and "it is well established that … jailers … are employees of the sheriff …." *Anderson v. Lee County*, 2010 WL 550995 at *2 (M.D. Ala. 2010).  The Correctional Officer defendants all were employed by the sheriff's department.  (Stallworth Deposition at 6; Love Deposition at 5; Scott Deposition at 7; Turner Deposition at 6).  The Court thus concludes that the Correctional Officer defendants were all state employees and therefore state agents.  The plaintiff does not assert otherwise.

### 2. Function supporting immunity.

The fourth category of function giving rise to state-agent immunity is "exercising judgment in the enforcement of the criminal laws of the State." *Cranman*, 792 So. 2d at

---

[27] Ala. Code §§ 14-6-1, -105.

405.  "Whether those performing [the duties of a correction officer] bear the title of jail guard, warden or correction officer, overseeing the custody and punishment of law violators is as much a part of law enforcement as undertaking the detection and apprehension of such violators."  *Howard v. City of Atmore*, 887 So. 2d 201, 204 (Ala. 2003) (internal quotes omitted).  "Thus, the [fourth] *Cranman* categor[y] include[s] the guarding of a city jail by a regular municipal police officer."  *Id*. at 206.  The Correctional Officer defendants cite no case applying *Howard* to a jail operated by a sheriff rather than a city, but the plaintiff suggests, and the Court finds, no reason to believe the rule is any more stringent in that situation.[28]  From the discussion in Parts I and II, it is clear that the Correctional Officer defendants were exercising judgment in the performance of their law-enforcement duties of guarding inmates.  The plaintiff does not argue otherwise.  The  defendants have thus met their burden of showing their entitlement to state-agent immunity.

### 3.  Exceptions to immunity.

The *Cranman* Court identified several exceptions to state-agent immunity.  792 So. 2d at 405.   Of these, the plaintiff lists malice, willfulness and bad faith.  (Doc. 113 at 36).  As this Court has previously noted, "[f]or purposes of the immunity issue, 'willful,' 'malicious' and 'bad faith' all require evidence that the defendant acted with the intent to injure or with ill will towards the plaintiff."  *Lawrence v. City of Fairhope*, 2010 WL 1658786 at *13 (S.D. Ala. 2010).  As discussed in Part I.B, the plaintiff has no evidence

---

[28] *Howard*'s requirement that the defendant be a "regular municipal police officer" is a function of Section 6-5-338(a), which extends state-agent immunity only to a narrow range of city employees.  Under that provision, "a municipal jailer who lacks the authority of a police officer cannot claim immunity under concepts applicable to the immunity of a State agent …." *Walker v. City of Huntsville*, 62 So. 3d 474, 501 (Ala. 2010).  The limitations of Section 6-5-338(a) affect only city employees, not state employees such as the Correctional Officer defendants.  It is therefore irrelevant that Stallworth has never been a sworn officer.  (Stallworth Deposition at 9).

that Stallworth, Love or Scott acted maliciously with an intent to cause harm, and he advances no discernible argument as to Turner.[29]

### 4. Summary.

The state claims against Houston and Robinson are abated, as are the claims against Turner arising from the April 11 application of force.  The defendants have state-agent immunity from the remaining state claims.

### CONCLUSION

For the reasons set forth above, the Correctional Officer defendants' motion for summary judgment is **granted**.  Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 5th day of July, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[29] The plaintiff notes that state agents may lose immunity if they act beyond their authority, (Doc. 113 at 36), but he neither alleges that the Correctional Officer defendants so acted nor offers any basis for such an allegation.